IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

BONNIE GEORGE, ED MCKINZIE,            §
TIM WORSTEL, CEDAR DERAPS,             §
CASEY WASSER AND TAMMY                 §
VOLKART,                               §
                                       §
            Plaintiffs,                §          Civil Action No.: _____
                                       §
vs.                                    §          Judge _____
                                       §
POWERCET CORPORATION, GAS              §
TECHNOLOGY INSTITUTE (GTI),            §
OMEGA FLEX, INC., WARD                 §
MANUFACTURING, LLC, AND                §
TITEFLEX CORPORATION,                  §
                                       §
            Defendants.

## PLAINTIFFS' ORIGINAL COMPLAINT – CLASS ACTION

COMES NOW Plaintiffs, BONNIE GEORGE, ED MCKINZIE, TIM WORSTEL,
CEDAR DERAPS, CASEY WASSER AND TAMMY VOLKART, on their own behalf and as
Class Representatives on behalf of all similarly situated persons and entities, and submits the
following Complaint against Defendants: POWERCET CORPORATION ("PowerCET"), GAS
TECHNOLOGY INSTITUTE ("GTI"), OMEGA FLEX, INC. ("Omega Flex"), WARD
MANUFACTURING, LLC ("Ward"), and TITEFLEX CORPORATION ("Titeflex").

## INTRODUCTION AND NATURE OF CASE

Powercet and GTI may be hereinafter collectively referred to as the "GTI Report
Defendants." Titeflex, Ward, and Omega Flex are hereinafter collectively referred to as the
"CSST Defendants" or any one individually may be referred to as a "CSST Defendant." Unless
singularly identified, "Defendants" is hereinafter used to refer to all of the named Defendants.

1

1.     Since 1988, the CSST Defendants have been selling a flexible gas piping system in the United States, including in Missouri, known as Corrugated Stainless Steel Tubing ("CSST"). CSST is vastly thinner, and is claimed to be more installer-friendly, than traditional black iron pipe gas delivery systems that have been used by plumbers across the United States for more than 100 years.

2.     CSST consists of continuous, 300 series flexible stainless-steel pipe encased in an insulative outer (yellow) jacket.  As readily acknowledged by the CSST Defendants, today there are hundreds of millions of feet of this dangerous product in more than 10 million homes across the country—homes that have been labeled by the CSST manufacturers, and industry trade groups that support them, as "legacy installations." These legacy installations, and the danger posed to the homeowners who have CSST in their homes, are the focus of Plaintiffs' claims.

3.     Since 1998, the CSST Defendants have acknowledged that the yellow-jacketed CSST products they each design, manufacture, and sell to the public, are prone to catastrophic failure when exposed to electrical energy.  Yellow CSST is susceptible to failure in several ways: (1) when exposed to electric arcing from household appliances; (2) when subject to an indirect lightning strike; and (3) when exposed to a direct lightning strike.

4.     Yet, the CSST Defendants market and sell CSST knowing full-well that the yellow jacket encased around the metal tubing is highly susceptible to disintegration when exposed to even moderate voltage – caused, for example, by electric charge arcing from regular household appliances.  That in turn can cause a puncture in the flexible metal tubing thus igniting the gases flowing through it, or releasing carbon monoxide or other dangerous gases into the home.  Despite admitted knowledge of the risk of gas leaks and fires, these Defendants, jointly and singularly, embarked on a national campaign targeting the gas industry, government, and

2

public consumers that perpetuates an ongoing false and misleading message about how to purportedly mitigate the life and property threatening dangers that exist where yellow jacketed CSST is installed.

5.     In 2007, the CSST Defendants represented to the public as a part of an agreed settlement of a prior class action that additional "bonding and grounding" of yellow-jacketed CSST provided a viable solution to the unreasonably dangerous propensities that have been acknowledged by the gas industry, including the Defendants named herein. These CSST Defendants agreed to require a direct method of electrical bonding of their products within their respective Design and Installation Guides ("D&I Guides") and to provide notification to consumers warning them of the dangers associated with the continued use of yellow-jacketed CSST.    However, the bonding and grounding technique only protects consumers from indirect lightning strikes.  The remaining two threats—electrical arcing from household appliances and direct lightning strikes—continue to pose a danger even after bonding and grounding is done.

6.     Since 2008, all Defendants named in this action have been actively and concertedly involved in deceiving the public into believing that the dangers inherent in the use of the yellow-jacketed CSST product can be eliminated through the use of additional "bonding and ground" techniques when, in fact, those claims are not only misleading, but completely false.

7.     The yellow jacketing placed on the CSST actually focuses the electrical energy from a lightning strike onto the surface of the CSST making bonding and grounding a worthless "fix" to the danger. The CSST Defendants' national campaign promoting bonding and grounding provides potential scapegoats by focusing on installation and inspection rather than the defective CSST, but such campaign has no redeeming value to homeowners regarding the damaging and unreasonably dangerous product itself.

3

8.     The CSST Defendants, in a national "Yellow CSST Safety Campaign," with the aid, assistance and sponsorship of the National Association of State Fire Marshals ("NASFM") and the Air-Conditioning, Heating & Refrigeration Institute ("AHRI"), claim and represent that additional bonding and grounding of yellow-jacketed CSST gas systems will eliminate damage and failure of that product when exposed to lightning energy. These representations are misleading in their lack of specificity, for the "remedy" is actually designed, not for lightning protection, but simply for the prevention of electric shock to persons caused by household current. As a result, the "fix" does nothing to protect homeowners from the risk of explosion or fire as a result of a lightning strike.

9.     Each of Defendants' misleading claims about how to purportedly fix the problem posed by lightning-induced failures is targeted at, and has reached, the following persons and groups: Homeowners across the state of Missouri and the United States, state and federal legislators, home inspection organizations, Governors, local, state and national fire marshals, fire commissioners, Attorney Generals, and countless others.

10.     It is undisputed that the CSST Defendants named herein are aware of the dangers their product poses to the public, which they acknowledged in litigation filed across the country, in marketing materials disseminated to the public through websites and trade publications, and in the very names attached to the so-called lightning-resistant CSST now alternatively sold, such as "CounterStrike"™ and "FlashShield"™.

11.     Defendants' activities resemble the tactics deployed by the tobacco industry in the 1970's. More specifically, the Defendants have been and continue to be engaged in activities designed to twist, distort, and manipulate people into thinking what is being marketed by the Defendants is the truth. The Defendants are systematically putting a spin on the message they

4

deliver with the goal that it will be believed by all. Specifically, while the Defendants acknowledge in lawsuits that nothing will protect CSST from direct strike lightning, in their marketing campaign they refer to bonding and grounding as being a remedy to fix all risks associated with lightning. The marketing campaign sponsored by the Defendants is nothing more than smoke and mirrors with the intent to deflect attention from what is tragically wrong with their product.

12.     Since 2008, the CSST Defendants have hired and utilized experts who will readily accept payment in exchange for favorable opinions; attacked plaintiff lawyers and attempted to paint them as the bad guys; shifted the blame to other trades including electricians and plumbers; manipulated building codes and stacked the code organizations with individuals who are "friendly" to the gas industry; attempted to control their message through publications such as the report generated by Defendant GTI; identified scapegoats such as code officials and point the finger of blame at them for not doing more; blamed the building community for allowing new construction materials and alternative installation procedures; associated themselves with trade-friendly groups such as AHRI and NASFM as a way to lend credibility to their message; and, sponsored websites designed to communicate, among other things, positive messages about how bonding and grounding CSST will make families safe from CSST failures.

13.     The addition of a bonding and grounding "solution" to the inherent danger of yellow CSST is promoted as a lightning safety fix, and is directed at every homeowner in America who has yellow-jacketed CSST in their home. The additional bonding and grounding fix being marketed and sold by the Defendants imposes originally unforeseen costs on these homeowners, and more importantly, it is not even effective in eliminating the known danger. The national campaign bespeaks the unreasonable dangerous properties of CSST, but

5

intentionally and recklessly diverts focus to the manner of installation rather than to the danger of the yellow-jacketed pipe itself.

14.     Hundreds, if not thousands, of dollars have been spent by anxious homeowners in pursuing the bonding and grounding "fix." In light of clearly safer alternatives, the inclusion and use of yellow CSST diminishes the value of structures containing this version of piping, further harming the consumer. To actually remedy the problem, consumers will still need to spend thousands of dollars more to replace the defective yellow CSST in their homes since the "fix" marketed by the CSST Defendants is not a true solution to the dangers of yellow CSST.

15.     The deceptive acts of the Defendants result in continuing and intentional harm – marketing a known dangerous and defective product in conjunction with a misleading and false "safety campaign" which does not actually remedy the danger or ameliorate the diminished value of the structures containing yellow-jacketed CSST, violates the language and intent of the Missouri Merchandising Practices Act, and constitutes Unjust Enrichment.

## PARTIES

16.     Plaintiff and homeowner Bonnie George is a consumer of Titeflex's yellow-jacketed CSST, and is a citizen and resident of California, Moniteau County in the State of Missouri.

17.     Plaintiff and homeowner Ed McKinzie is a consumer of Ward's yellow-jacketed CSST, and is a citizen and resident of Columbia, Boone County in the State of Missouri.

18.     Plaintiff and homeowner Tim Worstel is a consumer of Ward's yellow-jacketed CSST, and is a citizen and resident of Columbia, Boone County in the State of Missouri.

19. Plaintiff and homeowner Cedar Deraps is a consumer of Titeflex's yellow-jacketed CSST, and is a citizen and resident of Jamestown, Moniteau County in the State of Missouri.

20. Plaintiff and homeowner Casey Wasser is a consumer of Titeflex's yellow-jacketed CSST, and is a citizen and resident of California, Moniteau County in the State of Missouri.

21. Plaintiff and homeowner Tammy Volkart is a consumer of Omega Flex's yellow-jacketed CSST, and is a citizen and resident of California, Moniteau County in the State of Missouri.

22. CSST Defendant Omega Flex, Inc. ("Omega Flex") is a company that develops, sells, markets or distributes CSST in the State of Missouri, but is incorporated and with its principal place of business in the Commonwealth of Pennsylvania. Defendant Omega Flex has not designated a registered agent for service in the State of Missouri. Therefore, service may be made by serving Missouri Secretary of State's Office; Attention: Lisa Werdehausen; PO Box 778; Jefferson City, MO 65102.

23. CSST Defendant Ward Manufacturing, LLC. ("Ward") is a Pennsylvania corporation. Defendant Ward has designated its agent for service of process in Missouri as CT Corporation System; 120 South Central Avenue, Clayton, Missouri 63105, and service on such agent is hereby requested.

24. CSST Defendant Titeflex Corporation ("Titeflex") is a company that develops, sells, markets or distributes CSST in the State of Missouri, but is incorporated and with its principal place of business in the State of Connecticut. Defendant Titeflex has not designated an agent for services in the State of Missouri. Therefore, service may be made by serving Missouri

7

Secretary of State's Office; Attention: Lisa Werdehausen; PO Box 778; Jefferson City, MO 65102.

25.     GTI Report Defendant PowerCET ("PowerCet") is a California corporation, and has its principal place of business in Santa Clara, California.  Defendant PowerCET markets itself as a firm providing training, testing, and consulting services, and such services have been continuously promoted in and further provided in the State of Missouri.  Defendant PowerCET has not designated a registered agent for service in the State of Missouri. Therefore, service may be made by serving Missouri Secretary of State's Office; Attention: Lisa Werdehausen; PO Box 778; Jefferson City, MO 65102.

26.     GTI Report Defendant Gas Technology Institute ("GTI") is a corporation incorporated in, and with its principal place of business in, Illinois. Defendant GTI markets itself as an independent third party provider of training, testing, and consulting services and such services have been continuously promoted in and further provided in the State of Missouri. Defendant GTI has not designated a registered agent for service in the State of Missouri. Therefore, service may be made by serving Missouri Secretary of State's Office; Attention: Lisa Werdehausen; PO Box 778; Jefferson City, MO 65102.

## JURISDICTION AND VENUE

27.     This is a Class Action lawsuit seeking monetary damages pursuant to Federal Rule of Civil Procedure 23.

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and the parties are citizens of different states.  Furthermore, jurisdiction is conferred upon this Court pursuant to the Class

8

Action Fairness Act in that damages exceed more than $5,000,000 in the aggregate, and the parties are citizens of different states. 28 U.S.C. § 1332(d)(2).

29.     This Court has personal jurisdiction because Defendants' contacts with the forum are continuous and substantial and because the claims of Plaintiffs and the Class arise out of Defendants' contact with the forum. Service can be had upon the named Defendants through the application of the Missouri long-arm statute and as outlined above.

30.     Plaintiffs are all citizens of the State of Missouri.

31.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendants engage in continuous and systematic activities within the State of Missouri. Specifically, as provided by 28 U.S.C. §1391(c), Defendants are companies that are deemed to reside in this District. Moreover, a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.

32.     Venue is further proper in the county of residence of any properly joined named class representative. Plaintiffs Bonnie George and Casey Wasser separately reside in Moniteau County, MO and each are properly joined class representatives.

33.     Upon proper effectuation of service, this Court shall have proper *in-personam* jurisdiction over the Defendants under the applicable federal statutes and state long-arm statutes.

## RELEVANT FACTUAL BACKGROUND

34.     This lawsuit arises from Defendants' joint and concerted efforts to market yellow-jacketed CSST (known to be unreasonably dangerous) and mislead the public by and through a national campaign of false and deceptive propaganda that demands additional expenditures by the consumer in exchange for an ineffectual "fix." Although yellow CSST decreases the value of a structure due to its inherent dangers, the Defendants have systematically devised a plan to

attempt to avoid the tremendous cost and inconvenience of remediating the CSST. Rather than actually eradicate the harm posed by yellow-jacketed CSST to homeowners across the State of Missouri, and in homes across the United States, Defendants instead seek to transfer the costs of inspection and the illusory "fix" of additional bonding and grounding to the consumer – a "remedy" that fails to address the unreasonable danger of the product and the immediate and ascertainable losses to the consumer.

I. **The Product: Yellow Corrugated Stainless – Steel Tubing or "CSST"**

35.    Corrugated Stainless Steel Tubing ("CSST") is a flexible tubing used to distribute natural or propane gas throughout homes. It was introduced in the United States in 1988 as an alternative to "Schedule 40" black iron piping.

36.    CSST consists of a continuous, flexible stainless-steel pipe with an exterior insulative jacket. The jacketing used for years was yellow – other colors have been developed and marketed – and it is the yellow CSST manufactured by the CSST Defendants, and the original generation of "Counterstrike"™ manufactured by Omega Flex, that are at issue in this litigation.

37.    CSST is promoted as being dramatically thinner, less expensive and more installer-friendly than the more robust black iron gas lines that have been in use for more than 100 years. However, CSST is actually more expensive than black iron pipe. Further, iron pipes do not entail the same unreasonable risk of electrical charge perforating the pipe, and thus do not pose the same risk of causing a gas leak and/or gas-fueled fires.

38.    Inevitably, after installation, CSST is exposed to electric current. It is exposed to electric current during electrical storms and lightning strikes, and even more frequently, it is

exposed in ordinary household circumstances where nearby sources of electricity – electric wiring or appliances – cause a "flashover" or an electric "arc."

## II.    The Danger: Yellow CSST is Unreasonably Dangerous

39.    Yellow CSST has long been acknowledged by the CSST Defendants to be susceptible to degradation due to exposure to fire or electrical energy from lightning.  Indeed, the voltage from such energy has been known to cause puncture holes in the tubing itself, allowing gas to escape with resulting fire and/or explosion in the structure where the yellow CSST is installed.

40.    The mechanism of this degradation is any electrical energy source sufficient to cause an "arc" between the CSST and any nearby conductive material – e.g., metal wiring, metal fasteners, metal bolts, etc. – which concentrates the voltage at a point to puncture or melt a hole in the tubing.

41.    The minimal amount of energy emitted required to generate the "arc" is the same as one would find in ordinary household electric current and can emanate from an ordinary household appliance. While the arcing phenomenon has been litigated in the context of indirect lightning strikes, the CSST Defendants ignore the risk to yellow CSST systems from household electric current or direct lightning strikes.

42.    In fact, as Titeflex disclosed in connection with its Patent No. 8399767 –for "Energy Dissipative Tubes" as a "fix" to the yellow CSST – the reason for the new invention is that:

> **Oftentimes, electrical currents will occur from inside the structure…This can often result in an electrical flashover or arc between the adjacent systems.**  A flashover occurs when a large voltage differential exists between two electrical conductors and the air ionizes and the material between the conductive bodies are punctured by the high voltage and forms a spark.

11

….

Metals are electrically conductive materials, making CSST a very good pathway for electrical currents. This leads to the potential for a flashover if the CSST is installed in close proximity to another conductor within a structure and either one become energized. **A flashover like this is <u>often</u> the result of a lightning event but it is foreseeable that other events may also be capable of producing a sufficient voltage differential between conductors. It is possible that a flash like this can cause enough heat generation to melt a hole in the CSST, allowing fuel gas to escape.** This scenario is worsened by the dielectric jacket that often surrounds the CSST. This jacket only typically breaks down in a very small area, creating a pinhole as a result of the flashover. This phenomenon focuses the flash and concentrates the heating of the stainless steel inside. The result is a reduced capability of the CSST to resist puncture from flashover compared to un-jacketed pipe.

**Accordingly, it would be desirable to provide corrugated tubing and sealing devices having an increased resistance to physical and electrical forces that approaches that of conventional black iron pipe.**

(Emphases added).

43.     Another, Patent No. 704417 for "Conductive Jacket Tubing," reveals how this kind of energy buildup causes the degradation of the yellow jacketing:

Another drawback to existing tubing is that the tubing is often contained within a jacket. Typically, the jacket is made from an insulative material. In the event that the piping is introduced to an electrical charge (e.g., from direct or indirect lightning), charge accumulates on the jacket and can burn through the jacket to the tubing resulting in a breach of the tubing.

44.     In other words, the yellow-jacketing is not conductive, rather it is dielectric or insulative. Moderate voltage breaks down the coating which then focuses the current to the small breakdown in the coating. This focusing concentrates the current causing the extremely thin walled CSST to melt through producing a leak and ignition.

45.     The CSST Defendants' patent filings reveal their knowledge of this actual danger as they try to justify the patents for new CSST products on the complete and utter inadequacy of the original yellow CSST product.

12

46.     The CSST Defendants have long been aware that household electric current emanating from inside a house can cause the same damage and destruction as a lightning strike. The energy buildup from the electric energy could disintegrate or melt the yellow jacketing, thus exposing the metal tubing underneath.  Once exposed, arcing between the metal tubing and nearby metal charged objects (like wiring or appliances) could cause holes in the tubing, in turn leading to gas leaks, fires or explosions.

47.     Accordingly, there have been thousands of fires – and countless more unknown to Plaintiffs and their Counsel at this time – due to the unreasonably dangerous yellow CSST that has been used and installed over the past decade. Indeed, yellow-jacketed CSST has been installed for over a decade since the truth about yellow-jacketed CSST has been realized, tested, and confirmed, and then the facts concealed by the CSST Defendants.

48.     The known danger of the yellow CSST product is why the CSST Defendants began introducing conductive, black-jacketed CSST into the marketplace.  The black CSST product is marketed to **NOT** require the "safety" bonding and grounding effort and expense. *See* Exhibit A p.1-2: www.csstsafety.com.

49.     Each of the CSST Defendants owns the safety website "WWW.CSSTSAFETY.COM."

50.     Defendant Omega Flex, Inc. owns and controls the website.

51.     Defendant Ward Manufacturing, LLC also owns and controls the website.

52.     Further, Titeflex Corporation owns and controls the website.

53.     The CSST Defendants, therefore, own and control "WWW.CSSTSAFETY.COM" jointly.

54.     As the CSST Defendants' safety website claims: "Manufacturers of black jacketed CSST products which have been tested and listed to ICC-ES LC 1024, 'CSST Utilizing Arc Resistant Protective Jackets,' may not require or include in their instructions for the additional direct-bonding step that is required with standard yellow CSST products." http://www.csstsafety.com/CSST-primer. *See* Exhibit A p.1: WWW.CSSTSAFETY.COM.

55.     "Bonding" essentially attempts to connect or tie all metal points in the gas system together so that they conduct at the same electrical potential level, thus (in theory) preventing an "arc" between areas of different electrical potential. In other words, if nearby electrical conduits are of the same charge (electrical potential) as the tubing, then no arc would occur.

56.     "Grounding" essentially attempts to provide stray electrical current with a path to the earth (ground). This is accomplished by attaching a larger wire (a ground wire or other ground mechanism) to the tubing to "remove" the electrical charge. The charge transfers to the ground wire or other "ground" to direct the electric charge away from the tubing. Electricity will generally take a conductive pathway away from negatively charged objects until balanced.

57.     At all times relevant to this action, the CSST Defendants sold, marketed, and distributed the yellow-jacketed CSST, or otherwise placed it into the stream of commerce, which ultimately ended up installed in Plaintiffs' homes, as well as in millions of other homes across America, including in structures belonging to Plaintiffs and the Class. These acts were taken with full knowledge of the dangerous inadequacies of yellow CSST.

## III.    CSST Defendants and Others Embarked on a Campaign to Conceal The Dangers of CSST

58.     The CSST Defendants have already admitted the inadequacies of the yellow CSST because of its susceptibility to degrade and cause fires due to arcing. *Despite the industry noting the absence of sufficient validation of the representations of bonding and grounding as a*

14

*safety solution,* the CSST Defendants began to engage in a National Safety Campaign promoting this "fix." Utilizing trade industry associations as front men in an effort to positively promote the "bonding and grounding" message, the "Yellow CSST Safety Campaign" was unleashed on homeowners, code and building officials, other industry associations, state and federal governments, and the public at large.

59. As a part of their unified "Yellow CSST Safety Campaign," the CSST Defendants acknowledged the risk that if lightning strikes "on or near a structure" the electrical current can travel "through the structure's gas piping system and cause a leak, and in some cases a fire." *See* Exhibit B - YELLOW CSST SAFETY CAMPAIGN BULLETIN. However, despite the CSST Defendants' awareness that there are two forms of damaging lightning strikes: direct strikes – where lightning attaches to the home/structure and, indirect strikes – where lightning strikes nearby a structure, the Bulletin significantly omits the reality that bonding and grounding does not protect the structure from direct strikes, nor is there any reference to the limitations on conduction by the yellow-jacketed system. Instead, the Bulletin generically, and misleadingly, associates bonding and grounding with an unquantified reduction of an unspecified risk based broadly on "lightning activity." *See* Exhibit B - YELLOW CSST SAFETY CAMPAIGN BULLETIN.

60. The "Safety Campaign" materially omits the critical fact that, not only does the Yellow CSST not stop the arcing, *it actually helps cause it*. The CSST Defendants are aware of industry expert opinions that the yellow CSST actually has no conductive value at all (meaning it does not distribute the electric charge); instead, the yellow-jacketing serves to *focus* the energy from an arc into the weakest points of the yellow-jacketing, disintegrating those points first and exposing the metal tubing to further energy, causing holes or perforations in the gas line, which can cause gasses to leak from the tube and ignite.

15

61.     Other experts have noted that installation practices render the jacketing a poor mechanism for insulating the metal tubing and preventing leaks and fires.  The CSST Defendants admit that the yellow jacketing is easily torn, punctured and ripped during installation and when, for example, being dragged through the attic in a home.

62.     Yellow jacketing heightens the danger so much that expert testing has concluded that *unjacketed* CSST would be better than having the yellow CSST.  Indeed, unjacketed CSST is as much as 25 times more resistant to puncture from exposure to electrical energy than yellow-jacketed CSST. The CSST Defendants further agree to the existence and industry use of a safer alternative to the yellow CSST.  Despite such concessions, however, the CSST Defendants continue to participate in a misleading "Safety Campaign" that promotes the ongoing marketing and sales of the yellow-jacketed CSST. Indeed, the CSST Defendants sold millions of feet of yellow CSST for millions more in profits after having confirmed the dangers of yellow CSST in 2008.

63.     Rather than take that knowledge to the public airwaves and commerce streams, CSST Defendants instead funneled misinformation to the market, attempting to quell anxiety about fires caused by electricity-induced failures of CSST by falsely promoting "bonding and grounding" as a way to fix the problem.

64.     For instance, on their cooperative "Safety" site www.CSSTSafety.com, the CSST Defendants contend that:

> *"Lightning is a highly destructive force.  Even a nearby lightning strike that does not strike a structure directly can cause all electrically conductive systems in the structure to become energized.  Nearby lightning strikes can result in a power surge that can damage certain gas tubing systems and ultimately cause a fire. Properly bonding and grounding the Corrugated Stainless Steel Tubing (CSST) significantly reduces the risk of damage and fire from a lightning strike."*

16

65. The website acknowledges that there are "areas with high lightning risk" such as "Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Mississippi, **Missouri**, New Mexico, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Virginia and West Virginia." http://www.csstsafety.com/CSST-lightning.html (emphasis added). *See* Exhibit A p.4: WWW.CSSTSAFETY.COM.

66. According to the National Weather Service, Missouri ranks sixth in the nation in average lightning strikes per square mile; indeed, Missouri averages more than a million lightning strikes per year. Although the deceptive acts of the Defendants certainly affect the United States as a whole, the importance of such deception severely affects the jurisdiction of Missouri in light of the increased lightning risks.

67. The proffered solution, bonding and grounding, is a false and illusory "fix" for the admitted risk of lightening risks. Starting in 2007 and through today, the CSST Defendants represent that: "Proper bonding and grounding will reduce the risk of damage and fire from a lightning strike." http://www.csstsafety.com/CSST-solution.html. *See* Exhibit A p.4: WWW.CSSTSAFETY.COM; *see also* Exhibit C- GASTITE TECHNICAL BULLETIN TB2007-01-01-26-07; WARDFLEX TECHNICAL BULLETIN #16-2007; OMEGA FLEX TRACPIPE 2007 INSTALLATION GUIDE §4.10; 4.10A. This representation implicitly indicates protection from both a direct and indirect lightning strike, yet Defendants know that bonding and grounding does NOT reduce the risk of fire from a direct lightning strike.

68. However, as noted above, lightning is not the sole source of the risk. CSST is also proven to fail due to common household electrical current—current that exists in all modern homes built since the early 1990's—and the CSST Defendants have known this through testing

they conducted and later concealed. The CSST Defendants' "Safety Campaign" and purported bonding and grounding "fix" utterly ignore the risk of yellow CSST breaking down from ordinary household electrical current.

69.     Although the CSST Defendants represent to regulatory agencies, the gas industry, homeowners, and others that bonding and grounding yellow CSST reduces the risk of this unreasonably dangerous product regarding both direct and indirect lightning strikes, bonding and grounding yellow CSST fixes nothing in the way of fire due to arcing from household electricity or direct lightning strikes.

70.     CSST Defendants promoted their scheme via a letter campaign, email campaign, on the Internet, and in face-to-face meetings with code and building officials, state and federal legislators, home inspection organizations, Governors, local, state and national fire marshals, fire commissioners, Attorney Generals, and countless others. *See* Exhibit D: YELLOW CSST SAFETY CAMPAIGN ACTIVITY UPDATE/ACTIONS 2013. The CSST Defendants worked in conjunction with the AHRI and NASFM to promote the bonding and grounding "solution" to those outlined above, including but not limited to key agencies such as the National Fire Protection Agency ("NFPA") and the National Association of Insurance Commissioners ("NAIC"). *See* Exhibit A: WWW.CSSTSAFETY.COM.

71.     Although critical admissions regarding the defects in yellow CSST and the start-up of the Safety Campaign began as early as 2007-2008, the carefully crafted, but ultimately erroneous message regarding the bonding and grounding solution was actually not fully tested or validated prior to its promotion. Admitting that lightning strikes are a common enough a threat to justify the large expense of "bonding and grounding," CSST Defendants have tried to make it look like they saved homeowners from a catastrophic, and perhaps, deadly event by promoting

18

bonding and grounding. In reality, the CSST Defendants' actions to promote this "fix" in the absence of proper testing and independent protocols operated as little more than distractions from the greater risks.

72.     In 2008, Robert Torbin, then a principal of Cutting Edge Solutions (and now an employee of Defendant Omega Flex), prepared what was described as a "guide" for the design and installation of electrical bonding for a CSST system. *See* Exhibit E: ELECTRICAL BONDING OF CSST SYSTEMS. Torbin noted that bonding and grounding "is an important factor in reducing the risk of injury, damage and fire due to electrical fault and/or lightning strike" and further clarified that "bonding and grounding" guidelines could only *reduce* the risk of damage to the CSST system based on *indirect lightning strikes. See id.*

73.     In this paper, Torbin, the self-proclaimed "Godfather of CSST", explicitly noted that although the installation instructions of each commercially available CSST system required the direct bonding of the yellow-jacketed CSST system, these CSST installation requirements were affected by differences in the accessories and components. *See id.* Torbin thereafter submitted a Tentative Interim Amendment ("TIA") to the appropriate NFPA committee to revise 250.104 of the 2008 and proposed 2011 Edition of the NFPA. *See* Exhibit F: 2009 NFPA SUBMISSION - TENTATIVE INTERIM AMENDMENT 941.

74.     The Tentative Interim Amendment #941 ("TIA 941") represented that "[t]he CSST industry has performed laboratory testing and engineering analysis on direct bonding that demonstrates a significant reduction in the potential for arc-induced damage to CSST when energized by lightning energy." *See id.* TIA 941 further noted the emergency nature of the problem, stating:

> There have been numerous accounts of damage to corrugated stainless steel tubing from both direct and indirect lightning strikes on or near residential structures

containing this type of gas piping system. The damage is consistent: an arc-induced perforation is created through the tubing wall from a voltage imbalance between the CSST and another electrically conductive system in close proximity. Fires are often associated with this type of damage and have resulted in partial or total losses of property.

*See id.*

75.     Proposed TIA #941 was not approved, and Torbin's appeal was considered by the NFPA Standards Council at its August 4-6, 2009 meeting. Although refusing to grant the appeal based on jurisdictional concerns, the Council noted that the industry balloting on Torbin's proposed TIA ***raised questions regarding whether the proposed bonding requirements for CSST had been adequately substantiated***. *See* Exhibit G: NFPA FINAL DECISION D#09-18. The Council requested the organization of a Council Task Force designated, in part, to identify potential research or data needs. *See id*. The "CSST Task Force" submitted a report to the Standards Council, which was discussed during the Council's March 2, 2010 meeting. *See* Exhibit H: NFPA FINAL DECISION D#10-02.

76.     The CSST Task Group reported to the NFPA Standards Council that it had sought information on the purported "research" allegedly supporting the sufficiency of the CSST bonding requirements, including any research performed by or on behalf of any manufacturers. *See id.* Although this research was specifically requested, the CSST Task Group reported that the information provided to it from the manufacturers was of "limited value" and "did not provide enough information for the CSST Task Group to ascertain that the proposed bonding remedy will provide adequate protection from lightning induced surges." *See id.* After review, the Council agreed with the Council Task Group that the CSST issues would need to receive further attention.

77. The Standards Council directed that the CSST industry or others advocating the continued use of CSST in gas piping systems should validate the safe use of the product through "independent third-party validated research and testing" that could be reviewed and evaluated by standards developers in a timely way. *See id.* The Council Task Group noted that the Fire Protection Research Foundation was discussing the possibility of undertaking a research program related to CSST. The Standards Council stated that whether through the auspices of the Research Foundation or other means, it was "incumbent upon the manufacturers or others promoting the use of CSST in gas piping systems to provide independently validated and reliable technical substantiation demonstrating that CSST can be safely used." *Id.*

78. The CSST proponents initially chose to utilize the services of the Fire Protection Research Foundation, and the Foundation initiated activities that resulted in a proposal entitled "Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage, Phase I (April 2011) – the "Phase I Report." *See* Exhibit I: NFPA FINAL DECISION D#12-15. The proposal constituted a review and gap analysis to inform a future research project designed to validate the proposed installation methods touted by the CSST Defendants as a "solution" to the yellow CSST dangers. *See id.* The Foundation further prepared the "Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage, Phase II, Proposal V2 (November 2011) – the "Phase II Test Plan". The Research Foundation solicited and incorporated input from the NFPA CSST Task Group and the NFPA Technical Committee in order to ensure that the test plan would meet the needs of the standards developers. *See id.*

79. The Research Foundation proceeded to solicit funding to carry out the proposed test plan. A delay was noted by the Standards Council as the Research Foundation waited for the industry's response and engaged in discussions with industry representatives regarding the scope

21

of the proposed test plan. Ultimately, the CSST industry objected to the scope of the test plan, particularly to the implementation of a test to evaluate the response to a simulated arc from a home electrical system. *See* Exhibit I: NFPA FINAL DECISION D#12-15. "The Research Foundation declined to revise the test plan to eliminate this test and sometime in early April of 2012, CSST industry representatives notified the Research Foundation that it had been decided not to proceed with the project at the Research Foundation." *Id.*

80.     In a letter dated April 9, 2012, an AHRI representative provided an "update" to the Standards Council regarding actions taken within the "CSST industry" to comply with the directives of NFPA FINAL DECISION D#10-02. Although nearly two years had passed since the Standards Council's request for a "timely" response to the lack of independent validation of the bonding and grounding "solution," the letter "asserted, without support, that the Phase I Reports "results" validated the appropriateness of using bonding to protect CSST against lightning induced arcing damage." The letter made no mention of the CSST Defendants' disagreement with the Phase II Test Plan, or the resulting decision to separate from the Research Foundation. *See* Exhibit I: NFPA FINAL DECISION D#12-15. Instead, the letter indicated that the CSST manufacturers agreed to fund additional research in an unspecified "Phase II Project," and in so doing identified GTI Report Defendants GTI and PowerCET, among others. *Id.*

81.     The Standards Council noted that the decision to fund the unspecified "Phase II Project" raised concerns that the CSST proponents were ignoring the language and intent of Final Decision #10-02. The Council noted that "to now unilaterally reject any element of [the Research Foundation] test plan is inconsistent with the requirement that the necessary research and testing be independent and third-party validated." *See* Exhibit I: NFPA FINAL DECISION D#12-15. Although use of the Research Foundation was not mandated, the CSST Defendants

were informed that the Phase II Test Plan as prepared by the Research Foundation, which included the input and modifications of the Council, should be implemented by reputable, independent, third party testing. *Id*.

82.     The CSST Defendants, and the GTI Report Defendants thereafter jointly conspired and cooperated in the creation of what is commonly referred to as the "2013 GTI Final Report." As noted in the 2013 GTI Final Report, the information contained therein was prepared by GTI "for the CSST Project Sponsors," and then submitted to the NFPA Technical Committee to provide retroactive "validation" to the CSST Defendants' bonding and grounding position.

83.     In the creation of the 2013 GTI Final Report, Defendant GTI, in conjunction with Defendant PowerCET and its Chief Engineer Michael Stringfellow, worked jointly and collaboratively with the CSST Defendants in crafting a report that facially, but falsely, promotes bonding and grounding as a "solution" to the dangerous propensities of yellow jacketed CSST. Among the deficiencies in the testing and corresponding results (but not to the exclusion of other concerns) are the following significant issues:

- The 2013 GTI Final Report centers on "charge" as being the controlling factor in damage to CSST. However, charge is only one component of the equation, and it ignores the role of voltage.

- Ignoring voltage leads to inconsistent and unreliable results. The proper discussion should center on energy – in order to convert charge to energy, the voltage must be known.

- The basic electrical characteristics noted in the 2013 GTI Final Report appear to be mis-measured or misstated. Use of an incorrect parameter (especially resistance) affects the waveform of both the voltage and current when the CSST is exposed to a transient event such as lightning.

- Flawed methodology in measuring the dielectric strength of the polyethylene jacket destroys the credibility of the results.

- The PowerCET/Stringfellow modeling analysis contained faulty assumptions, including but not limited to, incorrect base parameters, incorrect limit of

23

stated current input, and incorrect assumptions of voltage necessary to create a "flashover.

- The PowerCET/Stringfellow simulations only attempt to address one type of energy transfer from lightning – ground charge – and does so after incorrectly stating the current input.

84.    It was with regard to the special interests of the CSST Defendants that the GTI Defendants and Michael Stringfellow nationally promoted what could at best be described as a retroactive "validation" of the CSST Defendants' 2007-to-present representations regarding the "bonding and grounding" solution.  Ultimately, the tests, calculations and conclusions of the CSST Defendants' industry trade group mistakenly rely upon faulty resistance variable calculations that were crafted by agreement and through cooperation between the CSST Defendants and the GTI Report Defendants.

85.    Because these calculations are off by a factor of 10x, the relative safety conclusions are simply wrong.  When one adjusts the calculations to the proper resistance reading, the conclusions reveal unequivocally that bonding and grounding will predictably NOT provide a reasonable level of safety in the presence of nearby lightning strike.

86.    GTI, PowerCET, and Michael Stringfellow prepared the "2013 GTI Final Report" for the purpose and use of the CSST Defendants in promoting the national campaign of a safety "fix" to yellow CSST. With full knowledge of the intended public release of the collaborative report findings, GTI, PowerCET, and Michael Stringfellow crafted selective protocols for testing the mechanisms of lightning effects on CSST pipe systems, and the safety "solution" of bonding and grounding.  The CSST Defendants used the information prepared for them by Defendants GTI and PowerCET as the evidentiary source to support the Safety Campaign.  This "2013 Final Report," however, contained not only the deficiencies outlined above in ¶ 76, but also wholly

misrepresented the data used for the simulations as is now acknowledged in the "revised" draft. *See* Exhibit J: GTI REVISED DRAFT FINAL REPORT 2015 p.31.

87. On October 12, 2015, Defendant GTI provided notice of revised information "prepared by Gas Technology Institute ("GTI") for the CSST Project Sponsors" in the form of a "2015 Revised Draft Final Report." *See* Exhibit J: GTI REVISED DRAFT FINAL REPORT 2015 p.i. Admittedly still working in collusion with the CSST Defendants to retroactively validate the "CSST Safety" message, Defendant GTI now attempts to maneuver around the deficiencies of the 2013 GTI Final Report to protect the CSST Defendants from ongoing challenges to the Safety Campaign message.

88. The proposed 2015 revisions are significant:

- GTI admits the resistance per meter contained in the "Final Report" as measured by Lightning Technologies Incorporated were an order of magnitude too low (*See* Exhibit J: GTI REVISED DRAFT FINAL REPORT 2015 p.1; 11)

- Although the 2015 proposed revisions state that "the corrected values are exactly a factor of ten larger than those from the original report," the corrected resistance values do not "exactly" match up as stated. (*See* Exhibit J: GTI REVISED DRAFT FINAL REPORT 2015 p.1; 11)

- GTI represented in its 2013 Final Report that "the data generated by LTI and PowerCET * * * were evaluated by GTI to verify that the model results are reasonable" and went on to affirm that the "validated model can be used to arrive at recommending direct bonding configurations." The 2013 Final Report further stated that the validation report stemming from this data analysis and model simulations had been further evaluated by "a panel of industry advisors." The "Safety Campaign" charged ahead with the 2013 Validation of Installation Methods. The 2015 Revised Draft Final Report, however, withdraws this original confirmation of verification to assert the data *will be* evaluated by GTI and then a new "resulting report will be further evaluated by a panel of industry advisors" for verification. *See* Exhibit J: GTI REVISED DRAFT FINAL REPORT 2015 p.9)

- The significance of the inaccurate methodologies is clear upon comparison of the language of the 2013 Final Report and the 2015 proposed revisions (*See* Exhibit J: GTI REVISED DRAFT FINAL REPORT 2015 p.31):

| FINAL REPORT 2013<br><br>*D – Initial Simulations by PowerCET* | REVISED DRAFT REPORT 2015<br><br>*D – Initial Simulations by PowerCET* |
|---|---|
| | |
| This slide deck was produced by PowerCET for GTI. It contains a high level synopsis of the parametric measurements taken by LTI as a precursor to the simulations work by PowerCET. The presentation contains the results of a series of simulations produced by PowerCET after the basic parameter measurements **were completed by LTI and factored into the simulation model.** The simulations indicate that a 6AWG copper direct bonding conductor applied at the point where the gas service enters the residence can prevent CSST perforations caused by lightning induced arcing. This model was used to propose scenarios for further testing at LTI for the purposes of validating the accuracy of the simulation model. | This slide deck was produced by PowerCET for GTI. It contains a high level synopsis of the parametric measurements taken by LTI as a precursor to the simulations work by PowerCET. The presentation contains the results of a series of simulations produced by PowerCET after the basic parameter measurements were completed by LTI. **PowerCET chose to use their own measured value of CSST resistance for these simulations, 40 m$\Omega$/m for 1" diameter and 66 m$\Omega$/m for 0.5", rather than those provided by LTI.** The simulations indicate that a 6AWG copper direct bonding conductor applied at the point where the gas service enters the residence can prevent CSST perforations caused by lightning induced arcing. This model was used to propose scenarios for further testing at LTI for the purposes of validating the accuracy of the simulation model. |

89.    Although Defendant GTI originally represented it verified the Lightning Technologies Institute's data and Defendant PowerCET's "validated model," the 2015 Revised Draft Final Report confirms the lack of verification and ***admits the significant deception involving the use of the measured value of CSST resistance in the simulations by Defendant PowerCET.***

90.    The 2013 GTI Final Report was submitted to state and federal legislators, home inspection organizations, Governors, local, state and national fire marshals, fire commissioners, Attorney Generals, regulatory agencies, members of trade industry groups, and countless others. It is relied upon in the ongoing marketing efforts of the Safety Campaign, and the CSST

Defendants continue to this day to capitalize on their decision to not use an independent, third-party research group to validate the bonding and grounding safety "solution." Furthermore, the CSST Defendants used this same misinformation to block legislation that would have banned yellow CSST or required other products to be used, arguing that bonding and grounding should be legislatively adopted as the proper standard in light of the 2013 GTI Final Report. The 2015 Revised Draft Final Report now submitted by the GTI Report Defendants establishes the ongoing collusion and agreement between the CSST Defendants and the GTI Report Defendants to further the circulation of misinformation to these lawmakers, regulatory agencies, and political leaders.

91.     The CSST Defendants also went to electricians, builders, home inspection groups, installers, and distributors to "educate" them about the virtues of bonding and grounding in attempt to manufacture a *de facto* "industry standard" designed to shield the CSST Defendants from liability for the failure of yellow CSST, and the harm that could result from such a failure should the defective yellow CSST cause a fire, or a home to explode, and kill or seriously injure the family inside. The 2015 Revised Draft Final Report establishes the ongoing collusion and agreement between the CSST Defendants and the GTI Report Defendants in the circulation of misinformation.

92.     In addition to providing the above-described misinformation, the CSST Defendants are fashioning a scapegoat system to attempt to escape liability for yellow CSST failures by blaming faulty installation of CSST, or faulty installation of the bonding and grounding of such system. Indeed, Torbin's 2008 paper, submitted in conjunction with his proposed TIA, acknowledges the intent to shift responsibility away from the dangerous nature of

the yellow-jacketed CSST and on "to the contractors and inspectors." *See* Exhibit E: ELECTRICAL BONDING OF CSST SYSTEMS.

93.     The representations to consumers, regulatory agencies, contracting groups, legislators, and others are made without valid testing and verification to support their claims. Not only is the claim by the CSST Defendants that bonding and grounding prevents arcing unsubstantiated, it is actually *false*.  Bonding and grounding as set forth in the CSST Defendants' Design and Installation Guides, and purportedly validated by the 2013 GTI Final Report, are ineffective to prevent the danger of arcing that causes holes, leaks, fires and explosions.

94.     The only thing the bonding and grounding campaign accomplishes for purposes of this lawsuit is to confirm that the CSST Defendants were, and continue to be, well aware that yellow CSST is unreasonably dangerous and poses an ongoing threat to the public.  What the CSST Defendants should have done was cease the manufacture and sale of yellow CSST, educate the public as to the *limitations and inadequacies* of bonding and grounding, and act to halt the ongoing diminution in value of those structures containing yellow CSST. Their failure to do so on their own accord, despite knowing the deceptive nature of the campaign and the continuing danger of yellow CSST, necessitates this lawsuit.

95.     Instead of ceasing their deceptive and dangerous behavior, the CSST Defendants acted (and continue to act) in a manner to deceive the consumer into purchasing an unreasonably dangerous product and/or an ineffective "fix" to mitigate such danger to protect market share and sales.  Indeed, in 2012, one CSST Defendant, Defendant Titeflex, set aside $100,000,000 to pay for future claims arising from anticipated yellow CSST failures and claims. That amount has increased since that time.  Rather than truly correct the problem and cease the sale of a known unreasonably dangerous product, the CSST Defendants allocate millions of dollars to address

28

claims and legal costs and contribute to the propagation of a deceptive "informational" campaign.

96.    Defendants' intentional, ongoing, and systematic disinformation "safety campaign," was intended to hide the true dangers of CSST from Plaintiffs and class members, and was designed to lull consumers into believing that CSST was not as inherently dangerous as it actually is.

## IV.    **Plaintiffs and the Class Have Been Damaged**

97.    Plaintiffs and the Class have been damaged.  Their homes are outfitted with yellow CSST that is unreasonably dangerous.  The cost of removing or remediating the yellow CSST is prohibitive to many homeowners, and the act of shifting the cost of remediation or replacement to them is the very type of market failure and economic harm that the law was designed to prevent.  Further, in the absence of this suit, Plaintiffs and the class members are left with few options:  either they accept the danger and the associated diminution in value of their homes; or they must personally undertake costly measures to mitigate the damages caused by the Defendants.

## **CLASS ALLEGATIONS**

98.    Plaintiffs hereby re-allege and incorporate the foregoing allegations as if set forth herein in their entirety.

99.    Plaintiffs bring the below causes of action individually and on behalf of others who are similarly situated pursuant to Federal Rule of Civil Procedure 23(a), (b).

100.    The putative Class for Count I is defined as:

*All persons that purchased for personal, family or household purposes, Yellow CSST or a structure with Yellow CSST installed in same, in the State of Missouri, between January 1, 2007 and the date of class certification.*

29

101. The putative Class for Counts II and III is defined as:

**All persons that purchased Yellow CSST or a structure with Yellow CSST installed in same in the United States between January 1, 2007 and the date of class certification.**

Further, proposed additional sub-classes may ultimately be defined at a later time.

102. The classes exclude:

    (a) Persons and/or entities who timely opt-out of this proceeding using the correct protocol for opting-out that will be formally established by this Court;

    (b) Persons whose homes were damaged or destroyed because of CSST, inclusive of subrogated carriers;

    (c) Any and all federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and

    (d) any member of the law firms or the Court or their respective staff or employees.

103. _Numerosity – Rule 23(a)(1)._ Plaintiffs do not know the exact size or identities of the members of the proposed Classes, since such information is in the exclusive control of Defendants. Indeed, in TIA 940 _supra,_ it is noted that "because of legal and product liability issues, the CSST manufacturers are reluctant to release data on the actual number of fires caused by damaged CSST." _See_ Exhibit F.

104. Upon information and belief regarding the installation of Yellow CSST in millions of homes, the classes likely encompass hundreds of thousands, if not millions, of consumers. Plaintiffs believe that the identities of Class Members can be readily ascertained from each CSST Defendants' books and records. Additionally, based on information and belief, the Classes are comprised of persons disbursed across the United States, as well as in the State of Missouri. As a result, joinder of all persons is impracticable. The disposition of Plaintiffs' claims will provide a substantial benefit to such persons and the court system by using Rule 23 as the vehicle to adjudicate the rights of such large Classes in one suit. Joining and naming each Class

Member as a co-plaintiff is unreasonable and impracticable. Such a requirement would only result in Defendants' retention of money, which is necessary to compensate the Classes.

105.     _Predominance and Commonality – Rule 23(a)(2); (b)(3)._ As to the Classes, there are common questions of law and fact that predominate over any questions affecting individual Class Members which include, but are not limited to:

(a)     Whether the CSST Defendants' Yellow product is defectively designed and unreasonably dangerous;

(b)     Whether Defendants' bonding and grounding campaign was intentionally misleading;

(c)     Whether the Plaintiffs' use of the product was foreseeable;

(d)     Whether the defect was a proximate and/or producing cause of Plaintiffs' injuries;

(e)     Whether there was a safer alternative design to prevent adverse consequences, damages, and/or injury from the CSST product;

(f)     Whether Defendants will be in a better position than the consumer to prevent circulation of defective products;

(g)     Whether Defendants can distribute the cost of compensating for injuries and/or damages resulting from defects by charging for it in the market place;

(h)     Whether the product was inspected and reached the user and/or consumer without substantial alteration in the condition that the product was designed, manufactured, marketed, sold, and/or distributed;

(i)     Whether Defendants failed to warn consumers that the product was defective and/or reasonably dangerous at the time it left Defendants' control;

(j)     Whether restitution is an appropriate remedy for Class members;

(k)     Whether Class Members are entitled to monetary damages or restitution for Defendants' wrongful conduct;

Case 2:16-cv-04056-MDH   Document 1   Filed 02/11/16   Page 31 of 44

(l)     Whether Class Members are entitled to an injunction requiring the CSST Defendants to cease and desist from selling, marketing, distributing, and/or placing into the stream of commerce its defective products;

(m)     Whether the CSST Defendants shall be enjoined from manufacturing, marketing, selling, distributing, and/or placing their defective products into the stream of commerce without adequate safety measures to prevent injury, harm, and/or damage caused by the product;

(n)     Whether the CSST Defendants shall be enjoined from continuing to market, sell, and/or distribute materials and services related to its misleading bonding and grounding "safety" campaign.

(o)     Whether Class Members are entitled to an injunction requiring the CSST Defendants to engage in a corrective advertising and marketing campaign to correct the false and misleading perceptions created by the misleading bonding and grounding "safety" campaign.

(p)     Whether Defendants are required to pay reasonable and necessary attorney's fees and costs associated with prosecuting this lawsuit.

106.     Furthermore, there are common questions of law and fact that are based in the same core evidence for all members of the Class such as: (1) the sale and installation of yellow CSST; (2) the defect in yellow CSST; (3) the national campaign of "safety" in bonding and grounding; (4) the ineffectiveness of bonding and grounding; (5) the superiority of FlashShield™ and/or iron pipe; and (5) the causal link between the deceptive, intentional and/or reckless acts of the Defendants and the damages.  In actions under the MMPA, it is the conduct itself that is at the core of the Complaint – the deceptive conduct at issue is common as to all of the Plaintiffs and Class Members.

107.     _Typicality – Rule 23(a)(3)_. The claims asserted by Plaintiff are typical of the claims of the Class.  Each Plaintiff and Class Member is a person who had yellow CSST installed in his or her home or building during the relevant time period, and/or incurred the expense of having his or her yellow CSST bonded and grounded. The CSST Defendants were

aware that yellow CSST is unreasonably dangerous, and the campaign of bonding and grounding did nothing to ameliorate such danger. Each Plaintiff and Class Member is therefore bringing a claim based upon the core evidence and facts outlined *supra* regarding the sale and installation of the product despite its known defects and the ineffective (but costly) "fix" of bonding and grounding.

108. *Adequacy of Representation – Rule 23(a)(4).* Named Plaintiffs will fairly and adequately represent the claims of the Class Members because Named Plaintiffs have an interest in seeing their claims through to resolution which will at the same time resolve the claims of the Class Members. The Named Plaintiffs are comprised of consumers of identified CSST Defendants, and each were a part of the Class of persons designed to be reached and affected by the national campaign regarding bonding and grounding. Plaintiffs are represented by competent counsel who have extensive experience in class action and consumer advocacy generally, and further who have extensive and specific experience with claims regarding yellow CSST, the individually named Defendants, and other CSST lawsuits. Such counsel can bear the cost of prosecuting the class action to conclusion. None of the Plaintiffs is antagonistic with the Class or has an interest in conflict with the Class.

109. *Superiority – Rule 23(b)(3).* This Class Action is not only the appropriate method for the fair and efficient adjudication of the controversy, but is, in fact, the superior method to all other available causes of action for the following reasons:

    (a)    The joinder of hundreds of thousands of geographically diverse individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

    (b)    There is no special interest by Class Members and individually controlling prosecution of separate causes of action;

(c)    Class Members' individual claims now may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, expensive, if not totally impossible, to justify individual Class Members addressing their losses;

(d)    When Defendants' liability has been adjudicated, claims of all Class Members can be determined by the Court and administered efficiently in a manner which is far less erroneous, burdensome, and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

(e)    This Class Action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of class claims to promote economies of time, resources, and limited pool of recovery;

(f)    This Class Action will assure uniformity of decisions among Class Members;

(g)    Without the Class Action, Class Members will go without restitution or money damages;

(h)    Without this Class Action, the restitution and/or remediation damages will be ordered and Defendants will reap the benefits of profits from defectively manufactured, marketed, and/or distributed products and systems;

(i)    The resolution of this controversy through this Class Action presents fewer management difficulties than individual claims filed in which the parties may be subject to varying indifferent adjudications of their rights;

(j)    Injunctive relief will be available to protect all future consumers from the sale, marketing, and/or distribution of defective products and further from the misleading components of the national "safety" campaign regarding the ineffectual bonding and grounding of Yellow CSST. (FED. R. CIV. P. 23(b)(2)).

110.    A class action is a superior mechanism in this case to individual actions because the Defendants have jointly acted in a way that is consistent as to all Plaintiffs and Class Members and thus injunctive relief would apply to the Class as a whole. Furthermore, a class

34

action is a superior mechanism to individualized adjudications because prosecuting separate actions by individual class members risk creating inconsistent rulings and standards of conduct.

111.    The class is readily identifiable from CSST Defendants' records, publicly available information and through discovery.

## CAUSES OF ACTION

112.    In collusion and with cooperation of the GTI Report Defendants, the CSST Defendants embarked on a national safety campaign to promote "bonding and grounding," which their own documents reveal are insufficient to protect homes from fire and ignition of the gas inside the CSST when exposed to normal household electrical current and direct lightning strikes.

113.    Rather than disclosing this information to Plaintiffs, the CSST Defendants conspired to and actively concealed that their products were unreasonably dangerous, unfit for their ordinary and/or intended use, and/or were unsafe. The GTI Report Defendants prepared a "Final Report" designed to retroactively "validate" the CSST Defendants' agenda of misleading consumers, regulatory agencies, and government officials.  Indeed, Defendants PowerCET and GTI acted in concert with the CSST Defendants in the manner of testing, reporting, and advertisement or advancement of the illusory safety "fix" to an unreasonably dangerous product.

114.    The Defendants' joint concealment tolls the running of any applicable statute of limitations. In the alternative, Plaintiffs could not have, with the exercise of real caution, prudence, or diligence, discovered the deceptive nature of the "bonding and grounding" public campaign within the applicable statute of limitations.  As a result, the statute of limitations is tolled making all Plaintiffs' claims timely filed.

## COUNT I

**(On behalf of Missouri Plaintiffs and Class Members against all Defendants)**

**VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT**

115.    Plaintiffs hereby re-allege and incorporate the foregoing allegations as if set forth herein in their entirety.

116.    Missouri's Merchandising Practices Act (the "MMPA") prohibits the act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce. Rev. Stat. Mo. § 407.020. "Unfair practice" under the MMPA includes the concealment of facts, particularly since such concealment presents a risk of, or causes substantial injury to consumers. The safety campaign and D&I guidelines actually mislead consumers to the consumer's detriment by misinforming them on the scope of the danger, and the ineffectiveness of the announced "solution."

117.    The conduct of both the CSST Defendants and the GTI Report Defendants constitutes an act, use or employment of deception, misrepresentation, unfair practices and/or the concealment, suppression, or omission of material facts in connection with the sale or advertisement of any merchandise in trade or commerce in that Defendants misrepresent that the Yellow CSST is safe, or can be made safe with the bonding and grounding "fix," when it in fact is not safe and cannot be made safe by bonding and grounding.

118.    At all times mentioned herein, the CSST Defendants were in the business of selling, marketing and advertising for sale Yellow CSST in trade and commerce within the State of Missouri as well as throughout the United States.

36

119.    At all times mentioned herein, the GTI Report Defendants acted in concert with the CSST Defendants to "validate" a purported CSST safety fix and in promotion of the "Safety Campaign" message of a bonding and grounding solution to the inherent dangers of yellow jacket CSST.

120.    At all times mentioned herein, the Defendants have jointly promoted a "safety fix" of bonding and grounding that is both false and costly to the citizens of Missouri as well as throughout the United States.

121.    Defendants have separately and jointly violated the MMPA by engaging in unfair, unconscionable and deceptive business practices. §407.010 *et. seq.* Defendants have utilized deception, false promises, misrepresentation, and/or the concealment, suppression or omission of material facts in connection with the sale, marketing, advertisement or distribution of the yellow CSST and further in promoting an inappropriate "remediation" process through bonding and grounding as set forth herein.  The GTI Report Defendants have acted in conformity and concert with the CSST Defendants to misinform, mislead, and otherwise deceive consumers, regulatory agencies, and government officials through the creation and promotion of the GTI Final Report and participation in the "Safety Campaign."

122.    The MMPA applies to acts committed "before, during or after the sale, advertisement or solicitation" of merchandise, and provides a cause of action for "any person who purchases or leases merchandise primarily for personal, family or household purposes."  Section 407.020 is intended to supplement the definitions of common law fraud to "preserve fundamental honesty, fair play and right dealings in public transactions."

123.    All Plaintiffs and Class Members purchased yellow CSST or purchased structures containing yellow CSST for personal, family, and household use during the class period.

124.    The CSST Defendants continue to manufacture, market, and sell a product they know to be dangerous, even though they admit a safer alternative is available.  The GTI Report Defendants continue to craft "industry reports" in support of the CSST Defendants' ongoing marketing and sales agendas.

125.    The CSST Defendants have knowingly made false or misleading statements of fact concerning the need for "bonding and grounding" as a service for yellow CSST homeowners. These Defendants further falsely and/or recklessly promote the "safety" of yellow CSST, utilizing the GTI Final Report as if the "fix" was independently validated, and as if the bonding and grounding "solution" renders the system safe from direct and indirect lightning or household electrical current.

126.    Plaintiffs and other class members have been damaged in that the value of a structure in which yellow CSST is installed is diminished, and further that such structure is worth less than the value they had originally believed it to have when purchased.  The presence of yellow CSST is specifically noted by home and building inspectors, and the value of Plaintiffs' homes is decreased due to the increased safety risk of a known dangerous product.

127.    Plaintiffs and Class members have further been damaged by the deceptive campaign of a "safety fix" of bonding and grounding that requires the consumer to pay significant monies to obtain additional inspections and incur bonding and grounding costs to obtain what is nothing more than an illusory safety benefit.

38

128.     As a direct and proximate result of the deceptive conduct alleged above, Plaintiffs and Class members have suffered ascertainable losses of money or property, real or personal, as a result of the use or employment by the joint Defendants of the methods, acts, or practices declared unlawful by § 407.020.

129.     Defendants failed to disclose information concerning yellow CSST and "bonding and grounding," which was known at the time of the transaction, with the intent to induce Plaintiffs and Class Members into a transaction which they otherwise would not have entered into had they known the truth.

130.     Defendants have promoted services and "product fixes" for which consumers must bear the cost, that do not meet consumers' reasonable expectations, that are not warranted, and that are ineffective.

131.     Plaintiffs and the Class has been proximately damaged in their money and property by Defendants' acts.  As noted above, actual damages may be recovered pursuant to the MMPA by "[a]ny person who purchases . . . merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of [an unlawful practice]." § 407.025.1. More specifically and as alleged above, the ascertainable losses and damages include, but are not limited to, the loss or other diminution in value of their home or building because of the installation of yellow CSST.

132.     The Defendants' conduct was intentional, wrongful, and outrageous, such that Plaintiffs and class members are entitled to the recovery of punitive damages as authorized by § 407.025.1.

133.     Plaintiffs and class members are also entitled to recover attorney fees as authorized by  § 407.025.1.

134.     This private civil action by Plaintiffs to enforce § 407.010 *et seq* is authorized by § 407.025.

135.     Class actions are authorized by the MMPA where an unlawful practice "has caused similar injury to numerous other persons." § 407.025.2.

## COUNT II

**(On behalf of Plaintiffs and Class Members Nationwide against all Defendants)**

**CONSPIRACY**

136.     Plaintiffs hereby re-allege and incorporate the foregoing allegations as if set forth herein in their entirety.

137.     The CSST Defendants and GTI Report Defendants, along with industry organizations, knowingly agreed, contrived, combined, confederated, and conspired among themselves to cause Plaintiffs' injuries by continuing to promote and install yellow CSST and by knowingly promoting bonding and grounding as a "safety fix," when it, in fact, is not.

138.     The CSST Defendants and GTI Report Defendants, along with industry organizations, acted with joint intentions in their retroactive "validation" process and in their ultimate representations in furtherance of the unlawful objective of engaging in the above-described deceptive practices to the detriment of consumers.  Such meeting of the minds in furtherance of these unlawful objectives establishes the existence of a civil conspiracy between all of the Defendants, and such acts have damaged the Plaintiffs and Class Members.

139.     Defendants committed the above-described wrongs by willfully misrepresenting and suppressing the truth as to the risks and dangers associated with the use of CSST and the continued dangers associated with the bonding and grounding "fix".

140.    In furtherance of this conspiracy, Defendants performed the following overt acts, among others:

(a) Since at least 2008, and likely earlier, Defendants have been actively and concertedly involved in deceiving the public into believing that the dangers inherent in the use of the yellow-jacketed CSST product can be eliminated through the use of additional "bonding and grounding" techniques when, in fact, those claims are not only misleading, but completely false;

(b) Defendants engaged in a unified "Yellow CSST Safety Campaign" touting the false "effectiveness" of bonding and grounding while failing to differentiate the dangers associated with indirect versus direct lightning strikes;

(c) Defendants concealed their research demonstrating that yellow-jacketed CSST is also proven to fail due to common household electrical current, in addition to direct lightning strikes;

(d) Defendants continue to participate in the misleading "Safety Campaign" to promote the sale and installation of yellow-jacketed CSST;

(e) Defendants promoted their scheme via a letter campaign, email campaign, Internet marketing, and through in-person meetings with code and building officials, state and federal legislatures, home inspection organizations, governors, local, state and national fire marshals, fire commissioners, Attorney Generals, and others;

(f) Defendants worked jointly to craft the 2013 GTI Final Report, as detailed above, that facially, but falsely, promotes bonding and grounding as a "solution" to the dangerous propensities of yellow jacketed CSST in an attempt to retroactively validate the efficacy of bonding and grounding.  The 2015 Revised Draft Report establishes the ongoing collusion between CSST Defendants and GTI Report Defendants to further the circulation of misinformation; and

(g) The Defendants colluded to educate electricians, builders, home inspection groups, installers, and distributors with false information regarding the efficacy of bonding and grounding in an attempt to insulate the Defendants from liability for failures of yellow-jacketed CSST.

141.    In furtherance of the conspiracy, Defendants committed unlawful overt acts including misrepresentations, and presenting misleading information in violation of the Missouri Merchandising Practices Act.

142.    Defendants furthered the conspiracy through the CSST Safety Campaign that promoted bonding and grounding.

143.    As a direct result of this conspiracy, Plaintiffs and members of the Class were damaged and said damages include, but are not limited to, the loss or other diminution in value of their home or building because of the installation of yellow CSST.

144.    Defendants were motived by their bottom line without regard for consumers who installed ill-fated yellow-jacketed CSST in their homes, notwithstanding their actual knowledge that the potential and probability for harm is great.

145.    The Defendants' conduct was intentional, wrongful, and outrageous and performed with an evil motive and/or reckless indifference to the rights and health of Plaintiffs such that Plaintiffs, therefore, seek punitive damages.

## COUNT III

### (On behalf of Plaintiffs and Class Members Nationwide against the CSST Defendants)

### UNJUST UNRICHMENT

146.    Plaintiffs hereby re-allege and incorporate the foregoing allegations as if set forth herein in their entirety.

147.    Plaintiffs and the nationwide Class Members conferred upon Defendants benefits that were non-gratuitous and constitute unjust takings.

148.    The CSST Defendants accepted or retained the benefits conferred by Plaintiffs and the Class Members despite the CSST Defendants' deceptive advertising, material

misrepresentations, and omissions of material fact with regard to the safety of yellow CSST and the efficacy of the bonding and grounding "fix."

149.    Retaining the benefits conferred upon the CSST Defendants by Plaintiffs and the Class Members under these circumstances makes the CSST Defendants' retention of the benefits unjust and inequitable.

150.    As a result of the foregoing, Plaintiffs and the Class Members have suffered damages, as set forth more fully above.

151.    Because the CSST's Defendants' retention of the benefits conferred by Plaintiffs and the Class Members is unjust and inequitable, the CSST Defendants must pay restitution in a manner established by the Court.

## VIII.

## DEMAND FOR TRIAL BY JURY

152.    Plaintiffs demand trial by jury on all issues triable to a jury under law or equity.

## IX.

## RELIEF REQUESTED

153.    Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request the Court to enter judgment on their behalf and against Defendants, as follows:

    i.    Certifying the Classes, as requested herein, certifying Plaintiffs as the named representatives, and appointing Plaintiffs' counsel as counsel for the Class;

    ii.    Ordering that Defendants must pay for notice to be sent to all class members;

    iii.    Finding that the Defendants are jointly and severally liable for Plaintiffs' and Class Member's injuries and economic losses;

    iv.    Awarding Plaintiffs and the Class Members disgorgement and restitution;

43

v.      Awarding Plaintiffs and the Classes treble damages;

vi.     Awarding declaratory and injunctive relief as permitted by law or
        equity, including: enjoining Defendants from propagating any
        further falsehoods about Yellow CSST and to issue corrective
        advertising and public relations campaigns; and directing
        Defendants to identify any further faults or inadequacies in
        current products or practices and correcting same;

vii.    Ordering Defendants to engage in accurate, corrective educational
        advertising;

viii.   Awarding interest on monies wrongfully obtained from the date
        of collection through the date of judgment;

ix.     Awarding attorney's fees, expenses, and recoverable costs
        reasonably incurred in prosecuting this action; and

x.      Any such further relief as the Court may deem just and proper.


Dated: February 11, 2016                Respectfully Submitted,


                                        STEELMAN, GAUNT & HORSEFIELD


                        By:     /s/ David L. Steelman
                                David Steelman, #27334MO
                                Stephen F. Gaunt #33183
                                901 N. Pine Street, Ste. 110
                                P.O. Box 1257
                                Rolla, MO  65402
                                Telephone:  573-341-8336
                                Fax:  573-341-8548
                                dsteelman@steelmanandgaunt.com
                                sgaunt@steelmanandgaunt.com

                                KAMBERLAW, LLC
                                Scott A. Kamber (not admitted)
                                100 Wall Street, 23rd floor
                                New York, NY 10005
                                Office: (646) 964-9600
                                Fax: (212) 202-6364
                                skamber@kamberlaw.com

44